AO 106 (Rev. 04/10) Application for a Search Warrant        AUTHORIZED AND APPROVED/DATE: s/ AUSA Nick Coffey 4/5/2024

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>Premises known as 1808 E. 32nd Street, Edmond, Oklahoma )<br>73013, surrounding curtilage, and any vehicles, garages, and )<br>outbuildings thereon ) | Case No. M-24-**320**-SM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 18 U.S.C. § 1956(a) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957 | Monetary Transaction in Criminally Derived Property |

The application is based on these facts:

See attached Affidavit of DEA Special Agent Sean Lively

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sean Lively, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/3/24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Suzanne Mitchell, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Target Location 5

1808 E 32nd St, Edmond, Oklahoma

1808 E 32nd Street, Edmond, Oklahoma is a single-story located in Oklahoma County, in the Western District of Oklahoma. The residence is constructed of light brown and dark brown brick and a roof with gray tiling and brown gutters. The residence contains two garage doors, which are both dark brown. The front of the residence also contains two sets of large windows without shutters. The front yard of the residence also contains a young tree supported by green and white metal poles.





## Attachment B

## ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 846 and 18 U.S.C. §§ 1956(a),(h) and § 1957 namely:

1.  Banking and financial institution records, wire transfer records, bank statements, cancelled checks, deposit slips, check registers, records of money orders, cashiers checks, and official bank checks, savings and checking statements from bank accounts, safe deposit box keys and business and financial transactions.

2.  Documents, records, or materials related to the distribution of illegal drugs and money laundering, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts and keys, cellular telephone agreements, bills and receipts related to cellular telephones, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics.

3.  Documents, records, or materials related to the laundering of drug money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle, and records relating to the ownership or renting of off-site storage facilities.

4.   The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

5.   Any digital device belonging to an individual reasonably believed to be connected to the conspiracy, used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

   a.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii.   evidence of the attachment of other devices;

2

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop,

notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6. Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, photographs, and other identification documents.

7. During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of an individual reasonably believed to be connected to the conspiracy herein and who is found at a Target Location and reasonably believed by law enforcement to be a user of the device, if found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF VARIOUS LOCATIONS ASSOCIATED WITH CHONG IU PHU, CHANH IU PHU, AND/OR LAN KIU PHU | Case No. ___M-24-320-SM___<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, Sean Lively, Special Agent of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) Enforcement Group in Oklahoma City of the DEA and have been so since February 3, 2020. Prior to my assignment with HIDTA, I attended the Basic Agent Academy Class in Quantico, Virginia. In addition, I have attended schools or trainings dedicated to drug investigations. Since becoming a Special Agent, I have been involved in a wide variety of investigative matters, including numerous investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. I have

participated in many aspects of criminal investigations, including surveillance, applying for and executing search warrants, criminal and administrative arrests, and interviewing and debriefing defendants, informants, and other witnesses. I have also worked with other local and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. Through my training and experience, I have become familiar with some of the methods by which illegal drugs are imported, distributed, and sold, as well as the means by which drug traffickers will then "wash" (i.e., launder) their illicit proceeds in order to disguise the source and nature of their profits.

2.     The facts set forth in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for each requested warrant, I have not included each and every fact known to me concerning this investigation.

3.     The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure search warrants for several addresses, all in the Western District of Oklahoma, belonging to and/or used by targets of a DEA investigation, specifically (1) 1225 E 33rd St., Edmond, Oklahoma ("**Target Location 1**"), (2) 1253 E 33rd St., Edmond, Oklahoma

2

("**Target Location 2**"), (3) 1261 E 33rd St., Edmond, Oklahoma ("**Target Location 3**"), (4) 3209 Warwick Place, Edmond, Oklahoma ("**Target Location 4**"); (5) 1808 E. 32nd St., Edmond, Oklahoma ("**Target Location 5**"), and (6) 2417 NW 153rd St. Edmond, Oklahoma ("**Target Location 6**") (collectively, "the Target Locations"), as described further in each warrant application's respective **Attachment A** (physical description), for evidence of violations of 21 U.S.C. §846 (drug conspiracy); 18 U.S.C. § 1956(h) (money laundering conspiracy); 18 U.S.C. § 1956(a) (laundering of monetary instruments), and 18 U.S.C. §1957 (monetary transaction in criminally derived property), as described further in **Attachment B** (description of items to be seized). Since this Affidavit is being submitted for the limited purpose of securing search warrants for the above-described properties, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

### BACKGROUND ALLEGATIONS REGARDING DRUG CASES AND MONEY LAUNDERING

4.     As discussed previously, I am, based on my training and experience, as well as the training and experience of other investigators in this case with whom I have consulted, familiar with the *modus operandi* of drug trafficking organizations (DTOs). I am also familiar with the many ways in

3

which DTOs will attempt to launder their illicit proceeds. Based on my training and experience, and participation in other money laundering and drug-related investigations, I know the following:

a)   I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their residences and private businesses. Relatedly, I am aware that money launderers connected to DTOs frequently keep assets, records, documents related to their transfer activities, and monies derived from the sale of illegal narcotics at private residences and businesses, sometimes acting in a "shell" capacity, where they are not easily detectable by law enforcement officials conducting investigations, and further, that these individuals will frequently maintain these locations in the name of other individuals, also to avoid detection by law enforcement agencies;

b)   I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them. Similarly, I am aware that money launderers connected to DTOs often own and operate seemingly legitimate businesses, sometimes hidden within larger businesses, and that money launderers often commingle lawful monetary transfers with unlawful transactions;

c)   I am aware that even though those businesses and properties are under an alias or other persons' names, money launderers continue to use and exercise dominion and control over them;

d)   I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business. Relatedly, I know that money launderers connected to DTOs often maintain on-hand quantities of currency derived from drug-trafficking in order to methodically transfer the funds, sometimes by

4

"structuring", often over prolonged periods of time, to avoid law enforcement detection, financial reporting requirements, and the additional scrutiny that using a bank invites;

e)  I am aware that drug dealers, as well as money launderers connected to DTOs, maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealer's organization. I also know these persons maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the receipt, transfer, and storage of financial instruments related to unlawful activities, even though such documents may be in code. It is particularly common that individuals engaged in money laundering connected to DTOs will keep ledgers related to their illegal activity because drug dealers commonly deposit large amounts of currency, often multiple times per week;

f)  I am aware that the aforementioned documents listing phone numbers and addresses, as well as books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers and money launderers have ready access to them, i.e., homes, automobiles, businesses and safe houses, and that the most common place for these items to be located is at the businesses used to execute the unlawful monetary transfers. Further, I know that money launderers associated with DTOs often keep these records for significant periods of time, as sometimes an accounting can be required;

g)  I am aware that drug dealers, as well as money launderers connected to DTOs, will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on digital devices (i.e., cellphones, computers, tablets, etc.) and that they often keep such digital devices, particularly cellphones, on their person or on the premises that they control. Further, I am aware that drug dealers and money launderers will often have multiple digital devices and will frequently use more than one digital device to help conduct their drug trafficking. I am also aware that drug

dealers and money launderers will use these digital devices to further their drug trafficking through the use of digital communication, including, but not limited to, e-mail, calls, and instant messaging. Further, I am aware that drug dealers and money launderers will attempt to conceal the information on their digital devices that is relevant to their criminal activities through the use of encrypted applications (i.e. WhatsApp, Signal, Silent Phone) and security locks on their devices;

h)    I am aware that it is common for drug dealers and money launderers connected to DTOs to conceal contraband, proceeds of drug sales, and records related to drug proceeds or the transfer thereof in secure locations within residences, garages, storage buildings, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies; and

i)    I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits. I am also aware that drug dealers, or money launderers on their behalf, will utilize banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts.

## PROBABLE CAUSE

### Background of Investigation

5.    In 2018, Oklahomans voted in favor of State Question 788, which authorized the State of Oklahoma's medical marijuana program ("Oklahoma's MMP"). Oklahoma's MMP created the comprehensive regulatory framework governing the cultivation and distribution of marijuana for medicinal purposes within Oklahoma.

6.      Marijuana manufacture and distribution remained illegal under Oklahoma law for those who did not abide by Oklahoma's MMP, including for those who did not legally obtain the proper commercial grower licenses and registrations with the State of Oklahoma. Similarly, Oklahoma's MMP limited marijuana possession to those holding medical marijuana licenses and restricted the amounts a license-holder could possess. Marijuana, of course, remained a Schedule I controlled substance under federal law; as such, its manufacture and distribution were prohibited by the Controlled Substances Act.

7.      Oklahoma's MMP was largely governed by the Oklahoma Medical Marijuana and Patient Protection Act, which set forth the legal requirements for persons seeking licenses to participate in the medical marijuana industry, including Oklahoma Medical Marijuana Authority ("OMMA") commercial grower licenses ("OMMA licenses"). Under the MMP, an individual could not own and operate a marijuana grow unless he or she had first received an OMMA license. At all relevant times, applications for OMMA licenses had to be complete and accurate in every detail, and all applications had to show that at least seventy-five percent (75%) of all members, managers, executive officers, partners, board members, or any other form of business ownership were Oklahoma residents.

7

8.      Prior to August 31, 2019, applicants for OMMA licenses could establish Oklahoma residency by providing proof of residency, such as an Oklahoma driver's license, a residential property deed, or a residential lease. On August 31, 2019, that requirement was modified to require the applicant to provide proof of Oklahoma residency for at least two years immediately preceding the date of application or five years of continuous Oklahoma residency during the 25 years immediately preceding the date of application.

9.      Additionally, all commercial growers were required to apply for and obtain a registration with the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control ("OBN registration") prior to commencing operation, i.e., growing marijuana.

10.     In the years following the passage of Oklahoma's MMP, the OMMA granted more than 9,000 commercial grow licenses. Many of these commercial grows were established fraudulently, with their owners making false representations on applications for OMMA licenses and OBN registrations. Sometimes the true owners falsely stated that they were Oklahoma residents. Other times, the true owners did not list themselves on these applications, instead listing third parties who had no relationship to or controlling interest in the grow operation. This "ghost-ownership scheme" resulted in numerous individuals, including illegal aliens and foreign nationals, as well as U.S. citizens of states other than Oklahoma, illegally

8

receiving OMMA licenses and OBN registrations and operating marijuana grows. In addition to being established fraudulently, many of these illegal marijuana grows supplied the black market, sending marijuana out of state.[1] Oftentimes, these "ghost owners" did not act alone in establishing these black-market grows, instead relying on real estate or legal professionals to help them evade Oklahoma's MMP requirements.

11.    In late December of 2020, the DEA's Oklahoma City District Office, in tandem with the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBN), began a joint investigation into: (1) the proliferation of out-of-state and/or foreign organizations establishing marijuana farms in Oklahoma and subsequently distributing the drug out of the state and the country—in violation of both federal and Oklahoma law and (2) these grow operations' connections to other illegal activities, such as labor trafficking, bulk cash smuggling, unlicensed money remitter services, and conventional money laundering. As the investigation progressed, investigators also identified connections with other DEA cases throughout the country. In short, it appeared that DEA targets in other states—money launderers and drug traffickers had begun to funnel their money and criminal enterprises into

---

[1]    Oklahoma Stat. tit. 63 § 427.1, *et seq.*, dictates the "seed-to-sale" requirement in Oklahoma, namely that marijuana be grown in the state and then sold or transported to an Oklahoma licensed institution, such as an Oklahoma licensed dispensary.

Oklahoma to take advantage of Oklahoma's marijuana laws, which are notorious for having been poorly enforced.

12.    The investigation has shed light on several aspects of Oklahoma's medical marijuana industry. These observations are derived both from my personal investigation during the last few years and through conversations with state and other federal law enforcement officers.

13.    First, a large majority of Oklahoma marijuana grows, even those with OMMA licenses and OBN registrations, simply sell their marijuana on the black market rather than operating within the confines of Oklahoma's MMP. Drug dealers have moved to Oklahoma to grow and sell marijuana on the black market, that is, to other states, often in contravention of the particular state's marijuana laws—all in violation of both Oklahoma and federal law.

14.    Second, individuals in control of these grow operations have employed schemes involving ghost-ownership and shell companies in order to conceal the true identities of the owners and managers of these marijuana grow operations. In my training and experience, the true owners of a large share of these marijuana grow operations are not actually Oklahoma residents. Many times, they are not even on site to oversee their marijuana grow operations, as they reside in other states and countries.

15.    Third, the marijuana industry is largely cash-based, which leads marijuana grows to seek out ways to store and launder their proceeds. Most financial institutions will not accept money derived from marijuana cultivation and distribution because marijuana, even for medicinal purposes, remains a Schedule I controlled substance and thus illegal under federal law. But, needing access to banking services, many Oklahoma marijuana related businesses (MRBs) will nonetheless attempt to use traditional banks. I have seen numerous instances where the bank will simply close the MRB's bank account when it learns that the client is in fact an MRB. On the other hand, some smaller banks and credit unions in Oklahoma will accept money derived from marijuana distribution and sales assuming that the client business registers with the bank as an MRB and abides by certain reporting protocols to ensure that all marijuana grown and distributed by the MRB is in accordance with Oklahoma law. Nonetheless, given that a large share of the MRBs operating in Oklahoma are in fact supplying the black market with marijuana, these MRBs often fail to satisfy the reporting protocols and other requirements imposed by their financial institutions. I have seen numerous instances where the financial institution will close an MRB's bank account because, although they are registered with the bank as an MRB, they are not abiding by the bank's reporting protocols. (And indeed, they often cannot, as truthfully reporting sales to the bank would inculpate themselves as black-

11

market marijuana grows.)  MRBs have reacted to this lack of access to traditional banking services in several ways.  Some MRBs will submit incomplete data on sales and distribution—omitting any record of their black-market sales—to stay in "compliance" with a bank that is willing to accept marijuana-derived funds.  Alternatively, some MRBs will nevertheless attempt to bank with a traditional bank until it closes the MRB's account.  In addition, a large portion of these MRBs are forced to find unconventional ways to store and launder their money.

16.    On April 2, 2024, the Federal Grand Jury sitting in the Western District of Oklahoma returned an indictment charging **Chong Iu Phu, aka Alex Phu**, **(PHU)**, **Chanh Iu Phu, aka Shawn Phu**, **(CHANH)**, and Matthew Alan Stacy (STACY) with drug crimes, including drug conspiracy, in violation of 21 U.S.C. § 846.

*Chong Iu Phu, aka Alex Phu*

17.    As the investigation into these black-market MRBs progressed, law enforcement learned that foreign nationals and out-of-state residents who sought to evade the residency requirements to obtain an OMMA license and OBN registration were often aided by Oklahoma residents, including **PHU**. **PHU** is a real-estate agent and broker of his own realty firm Gold Tree Realty

("Gold Tree")[2], located at 1225 E 33rd St., Edmond, Oklahoma (**Target Location 1**).[3]    As discussed more below, **PHU** also owns several other companies related to the real-estate industry, including property management and property investment companies.  As one of the few Mandarin speaking real estate brokers in Oklahoma, **PHU** has been uniquely positioned to take advantage of the boom in the real estate market caused by the legalization of medical marijuana in 2018.  Oklahoma Secretary of State records reveal that hundreds of business LLCs, some now inactive, have been registered to Gold Tree's address at **Target Location 1**.  The vast majority of these registrations were found to be related to marijuana grow operations.   Many of these registrations also specifically listed their registered agent as Andrea Sheung— an employee of Gold Tree and an authorized bank signer and notary for Gold Tree.   Moreover, it appears that **PHU's** business has boomed alongside Oklahoma's illegal marijuana grow operations.  From 2008 to 2019, eleven newly formed LLCs listed 1225 E. 33rd St., Edmond, Oklahoma (**Target

---

[2]    Financial and tax documents for **PHU** use different variations of the Gold Tree name, such as Golden Tree Realty LLC and Goldtree Realty LLC in some instances. For consistency's sake, I refer to **PHU's** brokerage as Gold Tree herein.

[3]    While Gold Tree Realty continues to operate, it is not clear who is the broker at this point.  An open records search shows that the Oklahoma Real Estate Commission announced in September 2023 that it was suspending **PHU's** real estate license for a period of 18 months based on violations for, among other things, acting in bad faith by failing to make appropriate disclosures surrounding sales.

**Location** 1), as its registered address.  Then, from December 2019 to May 2021, more than 170 new LLCs listed this address as their registered address, with the vast majority of these being LLCs related to the marijuana industry.

18.    In addition, in May 2021 **PHU** established a consulting firm for the marijuana industry under the name of Golden Fortune Consulting LLC ("Golden Fortune").  Golden Fortune, whose registered agent was **PHU** prior to dissolving, was located just across the business park from Gold Tree, at 1261 E 33rd St., Edmond, Oklahoma (**Target Location 3**).  Investigators have determined that commercial marijuana grows in Oklahoma would contract Golden Fortune to complete monthly reporting obligations—such as amount of marijuana sold on a monthly basis—imposed on these grows by Oklahoma law.  That said, the sheer number of black-market marijuana traffickers that **PHU** has assisted, whether through brokering land sales, forming MRBs, or providing rental properties, leads me to believe that these MRBs simply hired Golden Fortune Consulting to help them evade OMMA reporting requirements.  In fact, as discussed herein, many of the black market grows that **PHU** helped set up listed some form of contact information for Golden Fortune.

19.    Investigators believe that **PHU** has served as a one-stop-shop for out-of-state residents and foreign nationals looking to operate marijuana grows and related businesses in Oklahoma.  **PHU** and his businesses offer a

14

variety of services.  **PHU** will find farm land and broker the ultimate sale for prospective marijuana growers to purchase, well aware that the individuals purchasing the land do not qualify to own a marijuana grow operation in Oklahoma.  **PHU** will also serve as the broker for purchases of residences to house both the grows' owners and workers.  Other times, **PHU**, through his companies, will rent residences to marijuana traffickers.  **PHU** will also submit applications to the OMMA and OBN for licenses and/or registrations on behalf of growers.    To help the applicants evade the Oklahoma residency requirements, **PHU** has provided individuals with fraudulent documents so that they can "prove" Oklahoma residency.  He has also provided false information on these applications—listing an Oklahoma resident as the owner despite the person having no actual ownership—so that his clients may obtain an OMMA license and OBN registration.  **PHU** also maintains marijuana grow operations by coordinating electrical, HVAC, and other industrial services for these grows—which I believe is in part to conceal the grow's true ownership. And finally, **PHU** himself appears to have marijuana grows that are out of compliance with Oklahoma law and which I believe are supplying the black market.

20.    Below I have provided specific instances of **PHU's** crimes.  This is not an exhaustive list and is simply provided so that the Court may understand the breadth of **PHU's** criminal activity.

*The Fraudulent Rental Agreements*

21.    Cooperating Defendant 1 (CD1)[4] was a black-market marijuana trafficker and foreign national who moved to Oklahoma from Colorado in late 2019.  CD1, his wife, and CD1's business partner Jiu Bing Lin, aka Jack Lin, were directed to **PHU** for the purposes of securing land and OMMA licenses for Jiu Bing Lin's marijuana farm, one of which CD1 and his wife would partially own.  Because this was prior to August 31, 2019, the Oklahoma *two-year* residency requirement had not gone into effect yet; rather, applicants for an OMMA license merely had to show that they were residents of Oklahoma.  CD1, his wife, and Jiu Bing Lin were not yet residents of Oklahoma, however.  To help Jiu Bing Lin evade these licensing requirements, **PHU** provided Jiu Bing Lin with a residential lease agreement between GTR Management Group LLC—a property management group **PHU** owns—and Jiu Bing Lin that stated that Jiu Bing Lin was renting a property at 2308 St. Annes Drive, Edmond, Oklahoma.  According to CD1, however, this was false, as Jiu Bing Lin was not living in Oklahoma at the time, and in fact, had never resided in Oklahoma prior.  (Financial records for Jiu Bing Lin also independently

---

[4]    In 2023, CD1 pled guilty in the U.S. District Court for the Western District of Oklahoma to money laundering charges, specifically that he laundered funds derived from the sale and distribution of marijuana.  CD1 is currently cooperating in the hopes of receiving a lesser sentence.  I am aware of no knowingly false information provided by CD1.

establish this.) **PHU** then directed Jiu Bing Lin to use the fraudulent rental agreement as proof of residency to obtain an Oklahoma driver's license at the DMV. Once Jiu Bing Lin had obtained his driver's license, **PHU** then sent him and CD1 to an attorney, **STACY**,[5] who completed and submitted on Jiu Bing Lin's behalf the applications for an OMMA license and OBN registration. One license was under the name Jack Lin LLC, an alias of Jiu Bing Lin. The other license Jiu Bing Lin obtained, however, was in the name of YYL LLC, for which Qin Fang—a mere worker at one of the future grow operations—was listed as the owner. Jiu Bing Lin then returned to **PHU**, who brokered the deals for Jiu Bing Lin's farms in Maramec and Mulhall, Oklahoma, for the purchase price of $690,000 and $630,000 respectively. According to CD1, who was an investor in the Maramec farm, both of these farms supplied the black market. (Further, both farms were subject to OBN inspections and/or search warrants in 2023, at which point investigators found additional evidence that the farms were supplying the black market.)

22.    **PHU's** supplying of a fraudulent rental agreement to Jiu Bing Lin was not a one-time occurrence. A confidential source (CS1),[6] who was an

---

[5]    Stacy is currently facing approximately 34 felony counts in the District Court of Garvin County, Oklahoma, related to his role in helping black-market marijuana traffickers obtain OMMA license and OBN registrations. *See State of Oklahoma v. Matthew Alan Stacy*, CF-2002-251, Garvin County.

[6]    I am not aware of any criminal history for CS1, who is cooperating with law enforcement in exchange for consideration on possible criminal charges.

employee of Gold Tree during this time, told law enforcement that **PHU** directed him/her to complete approximately twenty of these fraudulent rental agreements to be used by out-of-state residents seeking to evade Oklahoma-residency requirements for OMMA licenses. CS1 explained that **PHU** had shown him/her how to make these and that he/she (CS1) believed that **PHU** had made many more.

### PHU's Ghost-Licensing Scheme

23.    As previously mentioned, on August 31, 2019, a new law went into effect that required applications for an OMMA license to show Oklahoma residency for *two* years. Perhaps not wanting to create fraudulent rental agreements that were backdated two years, **PHU** then developed another scheme: he would simply place an Oklahoma resident's name on the OMMA license application despite that person having no ownership or control at the grow operation. For instance, OMMA records show that in 2020 **PHU** listed Andrea Sheung (his employee at Gold Tree) as the owner on several applications for OMMA licenses. The investigation has established, however, that Andrea Sheung has never owned or operated any marijuana grow.

24.    For instance, on April 23, 2021, law enforcement executed a search warrant at a marijuana grow operation at 4355 S. Midwest Blvd., Guthrie, Oklahoma, locating approximately 10,000 undocumented marijuana plants

and 70 pounds of undocumented processed marijuana product.[7]  According to OBN registration records, 4355 S. Midwest Blvd. was the location of Infinity Leaf Farms LLC—which listed Sheung as the 100% owner.  I believe, however, that this was an obvious attempt to conceal the true owner.  With the aid of a Mandarin interpreter, OBN interviewed Wen Yang, who was present at the execution of the search warrant at 4355 S. Midwest Blvd.  Yang stated that he, along with Lan Ou (who was not there), were the bosses of the marijuana grow operation, which he admitted was not in compliance with Oklahoma law in several ways.  More importantly, when asked about Sheung and OBN records listing her as the 100% owner of Infinity Leaf Farms LLC, Yang stated he only knew Sheung from her help in purchasing the property, and she had not

_____

[7]    Though Oklahoma law does not cap the number of marijuana plants a grow can have, each plant must be documented.  The failure to accurately document marijuana plants is a widespread problem in Oklahoma's marijuana industry.  I know from training and experience that one such reason grows do not accurately "tag" and inventory their plants and other product, as required by Oklahoma law, is that this product is not intended to be exchanged in a "legal" sale under Oklahoma's MMP.  Rather, it is destined for the black market. Moreover, OMMA and OBN suspect that many of these grow operations are understating the amount of plants in their possession and grossly overestimating the "waste" that they are required to report, if they are reporting at all.  Because each part of a marijuana product is usable in some way—i.e., THC can be extracted from both leaf and stalk—investigators believe that the "waste" is merely marijuana product that these operations are selling on the black market.  In short, because the METRC system allows state officials to track every marijuana plant grown and marijuana product sold— all within the confines of Oklahoma's medical marijuana program—grows that do not properly tag all their product are often engaged in selling that untagged product on the black market.

returned to the property since then.  Yang also confirmed that Sheung was not involved in the running of the facility or day-to-day operations.   Law enforcement also found a document, which purported to be a "binding contract between Andrea Sheung's Infinity Leaf Farms LLC and Wei Cai Yang and Twinpetals Green LLC" that stated that Wei Cai Yang "will be responsible to [*sic*.] all the daily operation for this facility at 4355 S Midwest Blvd, Guthrie OK 73044" and that "Sheung will not be responsible for anything liabilities [*sic*.] for this license."  The document, dated September 13, 2020, was signed by Sheung and Wen Cai Yang.  Sheung also notarized the document.

25.    Another cooperating defendant (CD2)[8] has also provided information on how **PHU** helped him/her and CD2's father, both residents of Kansas, obtain an OMMA license.  According to **PHU**, he could acquire a marijuana license for them for $15,000—to be paid in cash—and he would maintain the license for them for an additional yearly fee of $15,000, also to be paid in cash.  CD2's father agreed to the deal, and a few weeks later, **PHU** provided an OMMA commercial grower's license to CD2 and his/her father under the name of Goodness Nature LLC.  Neither CD2 nor his/her father's name was on the license, and CD2 stated that he/she did not know the

---

[8]    CD2 conducted the interview in consideration for his pending state charges in Kansas.  CD2 does have a pending Oklahoma state charge from December of 2021 for unlawful possession of marijuana during a traffic stop in McClain County.  I am aware of no false information furnished by CD2.

individuals listed on the license and that **PHU** had chosen those names. OMMA records show that the owner listed on the license was Nhoc Cu Dech. According to records provided by U.S. Immigration and Customs Enforcement, Nhoc Cu Dech is **PHU's** mother.

26.    Another example of **PHU** assisting others in fraudulently obtaining state marijuana licenses involved Confidential Source 2 (CS2). According to CS2, CS2 traveled to Gold Tree[9] in 2021, along with his/her mother, to sell their personal identifying information (PII) for $2,500 so that **PHU** could use this information to obtain an OMMA license for another client. (CS2 was merely selling the PII and had no intention of owning or operating a marijuana farm.)  CS2 stated that they met with an Asian male, identified as "Jeff", in the Spring of 2021 and provided him their PII.  CS2 stated that "Jeff" initially paid them $500, and told them to return in a few days after their background check had cleared.  CS2 stated they subsequently met with "Jeff" a few days later and after signing the necessary documents,  "Jeff" paid him/her the remaining $2,000 and told them to come back the next year in 2022 to conduct the "sale" again.  CS2 stated that in either April or May of 2022 he/she called Gold Tree to again sell his/her information but was turned

---

[9]    While CS2 did not state he/she traveled to Gold Tree, CS2 identified a photo of the building at 1225 E. 33rd St. (**Target Location 1**), which I know to be the site of Gold Tree.

away. A few days later, however, **PHU** called CS2 to invite him/her to come back to Gold Tree in order to conduct the same "sale" as last year. [10] CS2 subsequently met **PHU**, who CS2 knew only as "Alex," at another building in the same industrial park as Gold Tree, though CS2 could not recall which. CS2 again provided the PII, for which **PHU** paid CS2 a few hundred dollars, with a promise that they would be paid more in the future. I have confirmed that CS2's name was used as the listed grow owner on several OMMA applications. Furthermore, CS1 also stated that he/she recalled on at least one occasion scanning the identification documents belonging to individuals who had sold their PII to **PHU**.

*Maintaining Grow Operations*

27.    As part of the financial investigation in this case, investigators have reviewed bank records and other reports surrounding **PHU** and his businesses. Bank documents show that between July 20, 2020, and February 2021, a Discover account with co-signers of **PHU** and Sheung paid $251,075.54 to OBN, the Oklahoma Secretary of State, and the Oklahoma Medical Marijuana Authority (OMMA) for marijuana grow licenses and applications. Among those purchases are approximately 67 payments of $2,500—the cost of

---

[10]    The number CS2 provided for **PHU** was (405) 990-0488, which is also listed as the contact number on multiple OMMA and OBN license applications. Investigators know this number to be subscribed to **PHU** and that he also lists it on his business card.

a commercial marijuana license—to OMMA, corroborating that **PHU** was applying for and purchasing these licenses for others.  Additional payments from **PHU's** accounts include purchases to waste management and construction companies, further suggesting that **PHU** and Sheung—not the true owners—are making payments for the furnishing and upkeep of the marijuana grow operations.

28.    A further review of OBN records reveal that over 60 OBN registrations purchased by **PHU** had mailing addresses of either 13809 N Douglas Blvd, Jones, Oklahoma, or 3209 Warwick Place, Edmond, Oklahoma, two homes that, according to open-source records, belong to **PHU**.  Moreover, OMMA and OBN records show that numerous applications submitted by **PHU** list CS1, CS2, CS2's mother, and **PHU's** own parents—Nhoc Cu Dech and Man Seng Phu—as the grow owners.  Based on my training, experience, and knowledge of the investigation, I believe that **PHU** submitted applications for OMMA licenses and OBN registrations listing false names or names of third parties, thereby helping his clients fraudulently obtain these licenses and registrations and aiding and abetting his clients' drug trafficking.  It also appears that **PHU** is responsible for overseeing many of these grows.  CS1 has told investigators that for an additional fee, **PHU** would be responsible for coordinating jobs related to construction, electrical installation, and HVAC at the grows, as well as submitting OMMA documentation.  CS1 also confirmed

that **PHU's** brother **CHANH** is one of his employees at Gold Tree and works

with **PHU** to provide these types of services.

*Rental Houses for Marijuana Traffickers*

29.     As law enforcement has continued to investigate the explosion of

the black-market marijuana trade in Oklahoma, they have discovered

numerous instances where marijuana traffickers have rented residences from

**PHU** or his companies to be used as personal residences or stash houses.

30.     For example, as part of an FBI-led investigation into Dian Huang

Jiang, a Texas-based marijuana broker who was being sourced in Oklahoma,

law enforcement identified several houses rented by members of Jiang's

network to serve as marijuana stash houses, including 2340 Cashion Place and

2316 Cashion Place in Oklahoma City.  Both of these residences are owned by

**PHU's** real estate investment company, Infinity Investment Properties.  Jiang

is currently under indictment in the Northern District of Texas charging him

with conspiracy to use an interstate facility in aid of racketeering enterprises,

in violation of 18 U.S.C. §§ 1952(a)(1), (a)(3), in connection with his marijuana

trafficking.

31.     Law enforcement identified 2721 NW 58th St., Oklahoma City, as

another marijuana stash house and executed a search warrant there in

November 2022.  **PHU's** company Eagle Summit Properties owns this house.

Law enforcement also identified another residence, 515 Chisholm Trail,

Watonga, Oklahoma, owned by Eagle Summit Properties at the time, that was being rented to marijuana traffickers operating a black-market grow in Watonga. Given **PHU's** business model, I believe he is well aware that he is renting his residences to black-market marijuana traffickers, who are using these residences in furtherance of their criminal enterprises.

*Phu's Grows*

32. The investigation also leads me to believe that **PHU** is a ghost owner of several marijuana grows. Both interviews with sources, as well as evidence uncovered as a result of law enforcement action, lead me to believe this. For example, another cooperating defendant (CD3),[11] stated that **PHU** marketed himself as able to obtain OMMA licenses for out-of-state individuals for $20,000 cash and 10% of the grow's profits. CD3 thus stated that he/she believed that **PHU** had an ownership in many grows. Similarly, CD4[12] stated that he/she believes that **PHU** is a ghost owner of more than 15 marijuana grows. CD4 stated that some of these grow operations are on land owned by **PHU**, and if the grow owners cannot pay **PHU** rent (which he accepts in cash),

---

[11] CD3, a marijuana trafficker who lived in Oklahoma, is currently facing federal drug charges in the Western District of Louisiana. CD3 is cooperating in exchange for consideration on his/her pending charges. I am aware of no false information furnished by CD3.

[12] CD4, a marijuana trafficker, is presently facing federal drug and money laundering charges in the Western District of Oklahoma. CD4 is cooperating in exchange for consideration on his/her pending charges. I am aware of no false information furnished by CD4.

they will pay **PHU** in marijuana instead—which his brother **CHANH** sells for him.

33.    These statements by CD3 and CD4 are consistent with what the investigation has uncovered. And despite these statements, **PHU** does not list himself with OBN or OMMA as the owner of any marijuana grow operation, which I believe is a result of his wanting to distance himself from the marijuana grows in which he has a controlling interest and which he knows are supplying the black market. Nevertheless, **PHU** has not been able to hide his significant connections to grows that were fraudulently established and/or are operating on the black market.

34.    For example, the initial OMMA applications for Sandy's Green LLC, located at 295543 E 1620 Road in Marlow, Oklahoma (owned by **PHU's** company Poly Real Estate LLC), listed Andrea Sheung (the Gold Tree employee) as the grow owner. The applications also listed the Gold Tree address, 1225 E. 33rd St., Edmond, Oklahoma (**Target Location 1**), as the mailing address and what appears to be **PHU's** primary business cell phone number—(405) 990-0488 (the "-0488 number")—and primary email address—pgt16888@gmail.com—as the contact information for the business. **PHU** later submitted another application for Sandy's Green LLC on which he listed his mother, Nhoc Cu Dech, as the owner. On this new application, he listed Golden Fortune's address (**Target Location 3**), another one of his phone numbers,

(405)-808-9578 (the "-9578 number"), and the same email address under the contact information.  In February and March 2022, OBN conducted inspections at Sandy's Green LLC, finding numerous examples—such as untagged plants and processed product—suggesting that Sandy's Green LLC was selling marijuana on the black market.  During these inspections, the on-site workers needed to call **PHU** and Sheung multiple times to answer the inspectors' questions about marijuana sales and waste disposal.  Additionally, the workers on-site could not provide any information on who owned the marijuana grow.

35.    More recently, law enforcement has identified **PHU** as one of the ghost owners of several marijuana grows at 1900 Lowry Avenue, Oklahoma City.  This location (the "Lowry Complex") consists of ten buildings.  All are owned by Great Eagle Properties LLC, which in turn is owned by **PHU**.  In the fall of 2022, OMMA received three applications for licenses that listed the Lowry Complex as its location: (1) Greenprism LLC (Building #6), (2) Greengenics LLC (Building #7), and (3) Butterfly Moon Green LLC (Building #4).  The corresponding OBN applications, all of which were denied, listed Golden Fortune (**Target Location 3**) as the grows' mailing addresses and **PHU's** -0488 number as their contact number.  Also in September 2022, a fourth OBN registration application for Provident Prosperity LLC—an application bearing none of **PHU's** contact information and which listed Chang Zhang as the owner—was submitted and approved.  Provident Prosperity LLC

27

was thus approved to operate at its listed location—Building 3 of the Lowry Complex—and nowhere else.

36.    Then, on December 22, 2022, an OBN registration was submitted for Divine Forest LLC, also registered to Zhang and at the Lowry Complex. This application again listed under its contact information **PHU's** -0488 number and pgt16888@gmail.com. OBN denied that application.  Another OBN app for Divine Forest LLC, also registered to Zhang, was submitted on March 3, 2023, with **PHU's** same contact information.  Zhang appeared for a voluntary interview with OBN on May 11, 2023, in connection with her pending application for Divine Forest LLC.  When asked why she needed another grow license for the same site, 1900 Lowry, she explained that "we" wanted to keep the grows separate, but she could not say who "we" was, backpedaling and stating it was her decision. And when showed an overhead aerial image of the ten buildings at the Lowry Complex, Zhang could not even explain which buildings Provident Prosperity and Divine Forest would be operating in.  She nonetheless said she would be in charge of both grows. Zhang added that she only rented buildings 3 through 6 and that her landlord rented the rest out to others. She also stated she could not remember who the registered agent was for Provident Prosperity LLC. (The registered agent with the Oklahoma Secretary of State is **PHU's** brother, **CHANH**.)

37.    There were additional **PHU** connections to the grow.  Zhang was also listed as the owner on a OBN registration application for another grow operation, Five Start Venture LLC, which would be located at another property owned by **PHU**, 1000 SE 44th St., Oklahoma City.  When asked by OBN whether she recognized the registered agent for Five Start Venture LLC, Zhang said she did not know the person.  This person, however, was CS2's mother—the same person whose PII **PHU** had purchased.  Further convincing me of **PHU's** connection to the grow was that Divine Forest LLC, with the listed owner of Zhang, had applied for an OMMA license in 2021; that application listed **PHU's** -0488 phone number and Gold Tree's (**Target Location 1's**) mailing address.

38.    In June 2023 and February 2024, OBN conducted inspections of Provident Prosperity at the Lowry Complex, finding significant evidence that the facility was involved in black market trafficking, including thousands of undocumented plants and additional undocumented product.  Additionally, these inspections showed that each of the ten buildings at the Lowry Complex was a marijuana grow, despite only Provident Prosperity LLC, registered to Building 3, having an OMMA license and OBN registration.

39.    During the inspection on June 19, 2023, investigators interacted with an on-site manager identified as Kevin Wang.  Investigators have reported that Wang pretended to struggle understanding English at the

beginning of the inspection and attempted to call his "supervisor" named "Alex," whom he later stated was just a translator. One of the numbers Wang provided to investigators for "Alex" was **PHU's** -0488 phone number. Later during the inspection, Wang attempted to call another "translator" listed in his phone as "Angel" at phone number (580) 392-9143. (As explained below, in connection with the discussion of the search warrant at the garden supply store, investigators have confirmed this number belongs to **PHU's** sister, Lan Phu, whose alias is "Angel.")

40.     On February 29, 2024, OBN executed a search warrant at the Lowry Complex and seized over 82,000 plants and 1,955 pounds of processed product, much of which was not documented and not properly tagged.[13] OBN also found utility bills in **PHU's** name, lab results for marijuana testing bearing **PHU's** phone number, marijuana transport documents showing **CHANH** as the driver while utilizing vehicles registered to Eagle Summit Properties, and emails from Zhang to METRC regarding marijuana manifests. OBN also arrested Zhang for possession of marijuana with intent to distribute, possession of proceeds derived from illegal controlled dangerous substance

---

[13]     The OBN report specifically notes that "OBN Agents believe the un-tagged marijuana plants and un-tagged processed marijuana flower discovered at PROVIDENT PROPSERITY LLC are indicatives [sic.] of marijuana trafficking" in an attempt to "traffic the illicit marijuana out of state."

sales, and possession of a firearm during the commission of a felony. Zhang is currently facing charges in Oklahoma County.

41.    Though **PHU**, through Great Eagle Properties, is the owner of the Lowry Complex, my training, experience, and knowledge of the investigation leads me to believe he is in fact the owner of the marijuana grows, not just the landlord of the Lowry Complex.    Following the OBN inspections, Zhang provided OBN with a copy of her lease agreement, which showed she had been renting every building in the facility from **PHU** since March 1, 2023, for a monthly price of $10,000 per building.  But based on bank records for Provident Prosperity LLC's account at First Enterprise Bank from May 25, 2023, through November 30, 2023, no rent payments have been paid.  This leads me to conclude there are two possibilities for the discrepancy.  First, **PHU** could be receiving $100,000 in cash ($10,000 per building) per month.  But a significant financial analysis of **PHU's** bank accounts has not documented any such deposits.  Second and more likely, the lease agreement could be fake, meaning Zhang does not pay **PHU** rent—likely because **PHU** is the true owner (and is thus not paying rent to himself).  Moreover, records for Provident Prosperity's First Enterprise Bank account also document electronic utility payments listing "Alex Phu" on the memo line, suggesting that Zhang was making these payments on **PHU's** behalf.

42.     Finally, I believe that **PHU** is firmly in control of the Lowry Complex based off **PHU's** emails.   On November 6, 2023, the Honorable Suzanne Mitchell, United States Magistrate Judge for the Western District of Oklahoma, granted a search warrant for records associated with several of **PHU's** gmail accounts.[14] Upon executing the search warrant, law enforcement located several emails regarding payments by **PHU** for the Lowry Complex. Importantly, however, it also contained a receipt from an Oklahoma Secretary of State Electronic Filing from January 25, 2023, in which **CHANH** is listed as the "Managing Member" of Provident Prosperity LLC.

### *The Garden Supply Store*

43.     On January 11, 2024, law enforcement executed a search warrant at Citadel Garden Supply ("Citadel"), located at 4700 SW 25th Circle, Oklahoma City, Oklahoma.[15] The search warrant established that Citadel was acting as an informal bank for marijuana grows.  As explained previously, I know from my training and experience that many black-market marijuana grows cannot comply with bank regulations for MRBs and have thus located other places to store their money.  Records found in Citadel established that the marijuana grows were depositing hundreds of thousands of dollars in cash

---

[14]     Those emails included alexphu168@gmail.com, alexphu888@gmail.com, and pgt16888@gmail.com.

[15]     Citadel has banked and or operated under several different names, including Sweet Harvest Garden Supply LLC ("Sweet Harvest").

with Citadel; that money could then be applied to their account balance at Citadel or be later withdrawn.  Law enforcement also found in a safe located in the office of Kai Hao Chen, one of the Citadel managers, a stack of blank money orders banded together and with a receipt listing two grows that are closely tied to **PHU** and his brother **CHANH**.

44.    The first grow was listed as "apollo 168", with a listed address of the Lowry Complex.  As described above, I believe that **PHU** is the true owner of the marijuana grows at the Lowry Complex.  The second grow was Horizon Ridge LLC, with the address of 15788 S. 369th West Ave., Bristow, Oklahoma. OMMA records show that **PHU** first applied for an OMMA license for Horizon Ridge in September 2021, listing his mother, Nhoc Cu Dech, as the owner. According to OMMA records, Horizon Ridge LLC is no longer using the Bristow address.  The Bristow address, however, is now being used by Max Green LLC, whose 100% owner is **CHANH**.



*One stack of money orders for Horizon Ridge LLC.*

Printed: 12/23/2023 4:23:48 PM
Store: 1
Workstation: 3

**Sweet Harvest Garden Supply**

**Sales Receipt #42794**
12/23/2023
Cashier: Kyle
Page: 1

Sweet Harvest Garden Supply
4700 SW 25TH CIRCLE
OKLAHOMA CITY, OK 73128
姗州名佛 OKC
405-500-0886

Bill To: Horizon Ridge LLC
Horizon Ridge LLC
15788 S 369th West Avenue
Bristow, OK 74010
6262920271

| Item # | Item Name | Size | Orig Price | Qty | Price | Ext Price | |
|---|---|---|---|---|---|---|---|
| | MONEY ORDER | | | | | | |
| | 西瓜500 4103 /4102/3589三米 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 西瓜1000 2919/9276/8275 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4392/2918 月5朱 | | $0.00 | 1 | $0.00 | $0.00 | |
| | USPS 1000刀 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4190/4291/9486/4324/0590/0612 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4245/4267/4177/4188/4525/9453 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4536/9655/9565/9407/9418/9532 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 9660/9431/9420/9475/9464/4514 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4201/4234/4256/9622/1638/1627 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 1594/9666/1471/9707/9611/9576 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 1640/9521/4280/4302/4547/4313 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 9374/9688/1616/1605/1482/9600 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 4276/9385月50朱 | | $0.00 | 1 | $0.00 | $0.00 | |
| | 总数56500 | | $0.00 | 1 | $0.00 | $0.00 | |

|  | | Subtotal: | $0.00 |
|---|---|---|---|
| Exempt | | 0 % Tax: | + $0.00 |
| | | **RECEIPT TOTAL:** | $0.00 |

Thank you your purchase. Products must be returned the same condition as received within 7 days for full refund.
20% restocking fee applied for return after 7 days.

42794

*The corresponding receipt showing the "deposit" of the money orders with Citadel, aka Sweet Harvest.*

45.    Based on my training, experience, and knowledge of the investigation, I believe that **PHU** and **CHANH** are using these money orders in effort to launder their criminal proceeds from the Lowry Complex and **CHANH's** marijuana grow in Bristow.  I know that purchasing money orders is one such way to launder proceeds, as it offers the buyer a way to conceal the origin of the proceeds—here, marijuana trafficking.  I also believe that **PHU** and **CHANH**, by providing blank money orders to Citadel, are allowing Citadel to make payments on their behalf in a way that conceals the origin and ownership of the proceeds.

46.    The investigation has also uncovered numerous pieces of evidence that lead me to believe that **PHU** is one of the owners of Citadel.  For starters, CS1 stated that he/she believed, based on comments **PHU** had made about Citadel, that he was one of the owners.  Moreover, **PHU's** email account contained an email, on which he was copied, between **PHU's** sister Lan Phu (LAN) and Sadia Cheema, one of **PHU's** managers at Gold Tree, discussing setting up a bank account for Sweet Harvest.  Furthermore, Chen's office also contained a handwritten document that appears to be a current reflection of the store ownership and which lists "Alex; New Com" next to "30%", which I believe is documenting **PHU's** 30% ownership in Citadel, which he appears to have secured in part through some sort of commission.  All of this—CS1's statement, **PHU's** emails showing he is involved in setting up Citadel's latest

bank account (under the name Sweet Harvest), and the document found at Citadel purporting to reflect his 30% ownership, lead me to believe that he is one of the owners of Citadel, which again, I believe is a money laundering vehicle for marijuana grows across Oklahoma.

47.    While **PHU** and **CHANH** do not appear to work at Citadel, their sister LAN does.  A search of her office at the time of the search warrant revealed $170,000 cash in her safe.  Furthermore, records found in Chen's office documented the daily cash deposits made by marijuana grows.  According to these records, the person who would often receive these deposits was "A"— which I believe refers to Angel, an alias used by LAN.[16]

48.    In short, my training, experience, and knowledge of the investigation leads me to believe that Citadel is serving as a money laundering vehicle, both for **PHU's** and **CHANH's** grows and for marijuana grows across the state.  **PHU** appears to be an owner of Citadel, and his sister LAN serves as one of its managers.

---

[16]    Law enforcement has verified that LAN is using the alias Angel in connection with her work for Citadel.  For starters, there were several pay stubs found in Chen's office addressed to "Angel Phu Lan."  Law enforcement also called the phone number listed for Angel found in Citadel records.  During the call, in which law enforcement posed as a representative from Enterprise Truck Rental, Angel confirmed that she is in fact Lan Phu.

## THE TARGET LOCATIONS

**1225 E 33ʳᵈ St., Edmond, Oklahoma (Target Location 1)**

49.    **Target Location 1** is the official address of Gold Tree Realty, **PHU's** brokerage and realty firm that has been used to broker land sales in furtherance of black-market marijuana trafficking.  While Gold Tree Realty is now operating under the name "Gold Tree Realtors,"[17] Gold Tree Realty still appears to be operating as a real estate brokerage and property management company.

50.    I believe that **Target Location 1** will contain significant evidence of **PHU's** and **CHANH's** involvement in a drug conspiracy, in violation of 21 U.S.C. § 846.   First, given that **Target Location 1** is where more than 100 MRBs list their registered agent's address or mailing location, I believe **Target Location 1** will contain records of these marijuana grows.  This includes, for example, records related to Sandy's Green LLC, on whose OMMA application **PHU** fraudulently listed Sheung as the owner and **Target Location 1** as the mailing address.  I also believe that **Target Location 1** will contain relevant escrow files and other records relating to real estate transactions that **PHU** has brokered out of **Target Location 1** in furtherance of his clients' drug

---

[17]    As stated *supra*, note 3, this name change appears to have been prompted by the Oklahoma Real Estate Commission suspending **PHU's** real estate license in September 2023.

trafficking. This would include records relating to the sale of the property in Cement, Oklahoma, that **PHU** brokered on behalf of CD2 and CD3. In short, I believe that, at a minimum, **Target Location 1** will contain rental payment receipts, property purchase and escrow file documents, LLC certification documents, copies of marijuana licenses, and records of purchases related to marijuana grows.

**1253 E 33ʳᵈ St., Edmond, Oklahoma (Target Location 2)**

51.     **Target Location 2**, which is also owned by **PHU**, is located across from **Target Location 1** and in the same business park. Based on statements from CS1, as well as surveillance of **PHU** entering the property and **PHU's** vehicles parked in front of **Target Location 2** on a daily basis, **Target Location 2** appears to house **PHU's** personal office. **Target Location 2** is also the registered address of Poly Real Estate LLC, which is—according to bank documents completed by **PHU**—his  landlord company for marijuana grows. Many of these grows, however, have been identified as black-market grows. A public records search shows that Poly Real Estate owns **Target Location 2**.

52.     I believe that **Target Location 2** will contain rental payment receipts, property purchase and escrow file documents, LLC certification documents and marijuana licenses for Poly Real Estate's client grows and records of purchases related to marijuana grows. Poly Real Estate appears to

be at the center of the many real estate and/or housing needs that **PHU** provides black market marijuana traffickers.  For instance, the property in Marlow that housed the fraudulently established marijuana grow Sandy's Green LLC (which falsely listed Sheung as its owner) is owned by Poly Real Estate.  Similarly, Poly Real Estate also owns the site of another black market grow at 23515 E. 6th St., Yale, Oklahoma; when law enforcement executed a search warrant at this location on February 9, 2023, they found more than 24,000 marijuana plant and the typical indicia of black-market distribution, as well as a propane receipt in **PHU's** name.

53.    I also believe, however, that **Target Location 2** will contain bank records, purchase agreements and contracts with marijuana growers, drug ledgers, and records of bulk cash transactions.  For instance, on July 29, 2020, **PHU** deposited a $100,000 check from "Green Prosperity Investments" (GPI) into Poly Real Estate's account ending in 4719 at Bank of America.  The memo line on the check is "Lease/Deposit."  According to the Oklahoma Secretary of State's website, Green Prosperity Investment's address is 2024 S Main St., Newcastle, Oklahoma—a property that public records show is owned by Poly Real Estate.  Importantly, this property is also the site of a marijuana grow that CD3 and CD1 have both characterized as a black-market grow.  Bank records and currency transaction reports also show that **PHU** made large cash deposits into Poly Real Estate bank accounts throughout 2023, leading me to

believe these are rent payments from marijuana growers and thus deposits of drug proceeds. In short, I expect that **Target Location 2**, home of Poly Real Estate, will have records of financial transactions conducted with, or on behalf of, marijuana grows, some of which law enforcement have identified as black-market grows.

**1261 E 33rd St., Edmond, Oklahoma (Target Location 3)**

54.     **Target Location 3** was the registered address of Golden Fortune Consulting LLC, **PHU's** consulting business for MRBs. Although the business was dissolved in October of 2022, county records show that **Target Location 3** is still owned by **PHU**. Moreover, up until early 2023, **Target Location 3** was the site of CS1's office with Gold Tree.

55.     I believe that **Target Location 3** will contain escrow files and rental payment receipts, as well as records specifically related to **PHU's** marijuana-trafficker clients. For instance, on some of the OMMA license applications that **PHU** submitted fraudulently listing CS2 as the owner, **PHU** listed **Target Location 3** as the mailing address. **PHU** also listed **Target Location 3** as the mailing address on several OMMA license applications listing the Lowry Complex as the grow site. All of this leads me to believe that **PHU** is directing and overseeing the black-market grow at the Lowry Complex from **Target Location 3**. This, in turn, leads me to believe that **Target**

**Location 3** will contain, at a minimum, evidence of dominion and control for the Lowry Complex.

**3209 Warwick Place, Edmond, Oklahoma (Target Location 4)**

56.    Regular surveillance on **PHU** has established that **Target Location 4** is the personal residence of **PHU**. Investigators have regularly observed him sleep at this residence and then travel to work. **Target Location 4** is owned by **PHU's** company, Eagle Summit Properties.

57.    As stated above, I know from training and experience that drug traffickers and money launderers keep records and documents related to their assets used in furtherance of their crimes in their primary residences. I therefore believe **Target Location 4** will contain documents and ledgers specifically related to the financial operation of **PHU's** many companies, such as banking documents, drug and financial ledgers, bulk currency, partnership agreements, escrow files, etc.

**1808 E. 32nd St., Edmond, Oklahoma (Target Location 5)**

58.    Target Location 5 is **CHANH's** primary residence (as well as that of his parents) and is owned by Poly Real Estate. Utility records from the city of Edmond show that **CHANH** pays utilities at this location. Law enforcement has also regularly observed **CHANH's** personal vehicles at **Target Location 5** stay overnight. As **CHANH** was listed as the registered owner of two marijuana grows that law enforcement identified as black market, namely

41

Chanh Green LLC in Chandler and Max Green LLC in Bristow, I believe that **Target Location 5** will contain evidence of his dominion and control over those businesses and properties.[18] I also expect to find documents related to the operation of Provident Prosperity LLC—which operated at **PHU's** black-market Lowry Complex—as **CHANH** was listed as the Managing Member with the Oklahoma Secretary of State. Again, I know that the primary residence of a drug trafficker and/or money launderer is one location where they will frequently keep assets, records, and documents related to their drug trafficking and money laundering.

### 2417 NW 153rd St. Edmond, Oklahoma (Target Location 6)

59.    **Target Location 6**, owned by Infinity Investment Properties LLC, is the primary residence of LAN. As recently as the morning of April 1, 2024, law enforcement observed LAN at the residence. Over the past several weeks, law enforcement has regularly observed LAN's personal vehicle, as well her husband Ying Tse's vehicle, at **Target Location 6**. Further leading me to believe this is LAN's personal residence is that utility records show that Ying

---

[18]    As previously described, Max Green LLC is one of the grows listed on the blank stack of money orders found in the accountant's safe at Citadel Garden Supply. Its location in Bristow is also the former site of Horizon Ridge LLC, on whose behalf **PHU** submitted an OMMA license application falsely listing his mother as the owner. Chanh Green LLC, on the other hand, was inspected by OBN on February 22, 2024, at which time investigators found a significant amount of marijuana plants and product that was not tagged, leading them to believe this was the product intended to be sold on the black market.

Tse, whom public records show married LAN in 2005 in Oklahoma County, pays utilities at the residence.

60.    As described above, LAN, aka Angel, is one of the managers at Citadel Garden Supply, a business located at 4700 SW 25th Circle, Oklahoma City, which was recently identified as a money laundering vehicle for marijuana grows across the state of Oklahoma. LAN appears to fill several different roles at Citadel. For example, she appears to be responsible for accepting large cash deposits from the store's marijuana-grower clientele.

| Received Date | Amount | Cash Deposit | | |
| | | Deposit Date | Custody Person | Deposit Person |
| 12/13/23 | $ 49952 ✓ | 12/15/23 | X | |
| 12/14/23 | $ 55436, ✓ | 12/15/23 | | |
| | $ 105388, | | | |
| | | | | |
| 12/15/23 | $ 96524, ✓ | 12/18/23 | | |
| 12/16/23 | $ 191834 ✓ | 12/18/23 | | |
| 12/17/23 | $ 53438, ✓ | 12/18/23 | | |
| | $ 242796 | | | |
| | | | | |
| 12/18/23 | $ 81160.00 ✓ | 12/21/23 | | |
| 12/19/23 | $ 79825.00 ✓ | 12/21/23 | | |
| 12/20/23 | $ 24951.00 ✓ | 12/21/23 | | |
| 12/13/23 | $ 50000.00 ✓ | 12/21/23 | | |
| | $ 200950.00 | 12/21/23 | | |
| | $ 260606, | | | |
| | | | | |
| 11/4/23 | $ 1171, ✓ | 12/21/23 | | |
| 12/20/23 | $ 9140, ✓ | 12/21/23 | | |
| | $ 10317, | | | |

43

Investigators believe that the *A's* in the "Custody Person" column refer to LAN's alias, Angel—an alias she confirmed during her call with law enforcement.[19] LAN's accepting large cash deposits from the grows may also explain why her safe contained $170,000 in cash. I know from training and experience that money launderers connected to DTOs often maintain on-hand quantities of currency derived from drug-trafficking in order to methodically transfer the funds, sometimes by "structuring", often over prolonged periods of time, to avoid law enforcement detection, financial reporting requirements, and the additional scrutiny that using a bank invites.

61. Additionally, LAN's office contained several notebooks documenting tasks to be done for specific grows, such as paying OBN registrations and ordering more supplies. Many of these grows referenced in LAN's notebooks—like City Bloom LLC, Splendid Garden, Blue Hilltop, Jasmine Green, Rachel Green, etc.—were those fraudulently set up by **PHU**. The notebooks also contained QuickBook login info for the grows, leading me to believe that LAN is involved in these grows' daily operations. Finally, LAN's notebook contained entries suggesting she is monitoring certain criminal prosecutions, including those for money laundering, which I believe based on my knowledge of the investigation are likely those involving Citadel's clientele:

---

[19]    *See supra*, note 16.

> California ID.
>
> Former Job: restaurant owner.
>                 sold to
>
> Wrote down: restaurant name.
>   grow facility.
>   money laundering.
>                     open.
>   "Skyone"    " ete cake"
> If you want to protect yourself, you
> better working with me.

62.    I know from my training and experience that money launderers connected to DTOs frequently keep assets, records, documents related to their transfer activities, and monies derived from the sale of illegal narcotics at their personal residences.  Consequently, investigators expect to find documents related to LAN's dominion and control over Citadel Garden Supply, including those related to her regular receipt of drug proceeds from Citadel's clients and those related to day-to-day operations of the grows she helps maintain, inside **Target Location 6**.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

63.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the Target Locations, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus,

the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

64.     *Probable cause.*  I submit that if a computer or storage medium is found at a Target Location, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

65.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

66.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

46

67.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

68.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

69.     I know that computer equipment is typically used in **PHU's** businesses' industries, that is, real estate, property management, and property investment. I also know that money launderers will often keep an electronic record of financial transactions involving drug proceeds that they have conducted. Given this, there is reason to believe that there is a computer system currently located at the Target Locations.

70.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic

electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Locations** because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the

"who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.    In my training and experience, information stored within a computer or storage media can indicate who has used or controlled the computer or storage media. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.    For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).    The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the

49

owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes

it is necessary to establish that a particular thing is not present on a storage medium.

71.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.

Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

72.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a

later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

73.    Many of **PHU's** businesses are functioning companies that, at least as investigators can tell at this moment, do conduct some legitimate business. The seizure of office computers may limit these companies' ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, and to the extent possible officers will first seek to copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of Gold Tree or **PHU's** other companies so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of these companies. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## INFORMATION PERTAINING TO UNLOCKING ELECTRONIC
## DEVICES WITH BIOMETRIC FEATURES

74.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following.

75.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

76.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.

77.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

78.    Based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

79.    I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a

locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

80.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at a Target Location and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

81.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of an individual reasonably believed to be

connected to the conspiracy herein and who is found at a Target Location and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

82.    Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §846 (drug conspiracy); 18 U.S.C. § 1956(h) (money laundering conspiracy); 18 U.S.C. § 1956(a) (laundering of monetary instruments), and 18 U.S.C. §1957 (monetary transaction in criminally derived property) will be found at the **Target Locations**.  I therefore respectfully request issuance of search warrants for the **Target Locations**, said locations being more specifically described in each warrant application's **Attachment A**.


**FURTHER THE AFFIANT SAYETH NOT.**


I declare under penalty of perjury that the foregoing is true and correct this _____ day of April 2024.


_____
Special Agent Sean Lively
Drug Enforcement Administration (DEA)


Subscribed and sworn to before me this _____ day of April 2024.


_____
Suzanne Mitchell
United States Magistrate Judge


58